(*Knoxville.* September Term, 1930.)

Opinion filed December 15, 1930.

666

ELY, BUHL & ELY, for complainants, appellants.

D. J. KELLY, for defendant, appellee.

MR. JUSTICE COOK delivered the opinion of the Court.

The bill was filed to enjoin the enforcement of a city ordinance designed to regulate the use of the city market. The complainants who sue on behalf of themselves and others of common right are:

John J. May, producer and vendor of shrubs, trees and flowers.

Frank L. Sherrod, producer and vendor of vegetables and fruits.

Fritz Staub, a citizen of Knoxville.

As producers and vendors, complainants May and Sherrod distributed produce for a number of years, using available space on the city market.

It is charged in the original bill that Ordinance 279, filed as Exhibit 2, circumscribes the area of the market and the rights of marketers to an extent and in a manner that is unreasonable and void.

After suit was filed, Ordinance 279 was repealed and another, referred to in the record as Ordinance 317, was passed. It was attacked by an amended and supplemental bill as unreasonable, discriminatory and void.

At a hearing upon bill, answer and proof, the chancellor held that Ordinance 317 was valid and not open to attack, and dismissed the bill. Being of the opinion that Ordinance 279, which was repealed after complainants filed the original bill, justified the attack upon it, the chancellor adjudged all the costs of the cause against the city.

Complainants appealed and have assigned errors. They insist that Ordinance 317 is unreasonable, oppressive, contravenes both State and Federal Constitutions, and is therefore void.

The lot, 350 feet by 125 feet, upon which the public market is located, was conveyed to the city by deed from William G. Swan and Joseph A. Mabry, March 21, 1853, "to be used . . . for the purpose of constructing thereon a market house."

The map, Exhibit "A" to the testimony of W. N. Smithson, indicates that the market house, situated about the center of market square, covers a space 361.8 feet by 40.2 feet. The distance from the market house wall to the curb on the eastern side is 35 feet and from the market house wall on the western side to the curb is 34.5 feet.

The market house contains within its inclosure 54 stalls which are rented by the city to dealers in country produce, meats and other food products. An open space between the stalls is used by small producers as a free market where they may deposit and dispose of their products brought in baskets or other small receptacles. The space along each curb opposite both sides of the market house has been for a number of years put to use by producers who sold from wagons stationed there. It appears from the record that between 400 and 500 pro-

ducers altogether use the public market and that about 300 each day dispose of their products on the market.

Before the enactment of Ordinance 317, the evidence shows that there were 117 available spaces where market wagons and trucks might stand at and near the curb. For a number of years some of those having produce for sale have preempted space along the curb by the use of what is called in the record "dead wagons." These are described as vehicles mounted by a covered body stationed in the street at the curb and kept there from early Monday morning until late Saturday night of each week, being removed by two men who, for hire, furnished parking space and moved the wagons from the market late Saturday night and returned them early Monday morning. Few, if any of these wagons, were self-propelling. They were not designed to be moved except in the manner and for the purpose above indicated. Seventy-three of the 117 available spaces on the free market were occupied by these dead wagons. Of the 300 producers who marketed produce each day at this market place, the 73 owners of the dead wagons monopolized that number of spaces, the remaining 227 made use of the 44 that were unoccupied.

The ordinance in question was designed to regulate the use of the market and certain of its provisions in their operation interfere with the practice that had prevailed among the owners of the dead wagons of holding space continuously by preempting it in the manner described.

It appears from the record that prior to the enactment of Ordinance 317, no uniform parking rules were observed and for lack of such regulation both sides of Market Square were congested, not only hindering traf-

fic but interfering in some instances with the service of the fire department.

By section 3 of the ordinance, spaces seven feet in width running the entire length of the market at a distance of 350 feet on both sides of Market Square were set apart as parking spaces where wagons and trucks might be stationed for the disposition of country produce. The wagons and trucks were so arranged that when parked against the curb they would stand at an angle of thirty degrees pointing with the current of traffic so that they might be removed and others stationed in their place without obstructing travel.

Other provisions of the ordinance will be referred to in the course of our discussion.

Taking the ordinance altogether, it apparently operates alike upon all persons similarly situated, is not unreasonable in its classification, and was designed to regulate the use of the public market by producers to the exclusion of dealers; and also was designed to open the market to a greater number of producers by the exclusion of the so-called dead wagons, which, in fact, were selling shops put on wheels, and permanently stationed through each week, both day and night, on the street against the curb.

The city had power to regulate the use of the market and also to regulate traffic over and through it. These stationary wagons, occupying as many as 73 spaces on the market into which the dealers or producers unloaded produce at irregular intervals from trucks, necessarily obstructed and hindered the general public in the use of the street and the city could, in the exercise of its police power, make the regulation to prevent it. It could also regulate the alignment of sales trucks and wagons

stationed along the curb in such position as to easily permit their passage from or to the line of traffic. This alignment would not unreasonably or unnecessarily reduce the free market space. There is no merit in the broad attack upon the ordinance.

Other assignments of error are directed at the action of the trial judge in sustaining certain specific provisions. These will be disposed of in sequence.

■ Subsection (b), section 2, provides that "no person, firm or corporation, truck grower or farmer shall have more than one vehicle, horse-drawn or motorized, for the sale of produce on any market place at any time." With power to regulate the market, the city could limit its use to producers generally and forbid monopolization of the maket by a favored class. Apparently all producers are afforded equal rights under this provision and none are discriminated against unfavorably. The discrimination is in favor of producers generally and against particular individuals.

It is complained that under this provision of the ordinance horse-drawn and motorized vehicles are favored to the exclusion of handcarts. In the exercise of its police power designed to regulate traffic on the highways, we can conceive of no reason that would forbid the city excluding from the dangerous lines of traffic on this congested market man-propelled vehicles. They might more properly occupy the sidewalks, if used so as not to interfere with pedestrian travel.

■ By subsection (c), section 2, "only bona-fide farmers and truck growers shall be allowed to have a vehicle on the market for the sale of commodities produced and grown by himself." The city having power to establish and regulate the market, could forbid use

of it by dealers other than producers. Such a regulation would not be void because discriminatory. *Dutton* v. *Knoxville,* 121 Tenn., 25.

By subsection (d), section 2, ''sellers from outside the State of Tennessee shall file with the director of public safety a certificate from the county court or other official having a seal of the county where his products are grown, showing he is a *bona-fide* grower or farmer, before he shall be authorized to sell products or occupy space on the market.'' Complainants do not fall within this classification, all being resident farmers and producers, and therefore could not complain of this provision because it does not affect them. Moreover, the city having power to establish and regulate the market, could forbid use of it by dealers other than *bona-fide* producers, and the foregoing regulation was designed only to ascertain whether or not the person occupying the space on the market is a *bona-fide* farmer or producer of another state and could require the certificate showing that fact. Such a provision does not appear to be unreasonable.

By subsection (e), section 2, it is provided that ''no salesman shall sell from more than one truck or wagon.'' The object of this provision is not apparent, especially in view of subsection (b), section 2, which limits the number of wagons that a producer may station at the market for purpose of selling his produce. There is no apparent reason to forbid a neighbor during the absence of the owner of an adjacent truck or wagon attending to the other truck, and for that matter making sales for him.

Subsection (f), section 2, provides that ''no transfer shall be made from one wagon or truck to another for the purpose of sale from said other wagon or truck

on any public market." The meaning of this provision is apparent from its language and, given its reasonable construction, it requires that the market shall not be obstructed by trucks or wagons unloading to another truck or wagon stationed at the curb or elsewhere on the market. Any other construction would be unreasonable. The provision could not be extended so as to forbid or penalize *bona-fide* farmers and producers from transferring their products from one truck to another truck elsewhere than on the public market, subject, of course, to compliance with other city traffic regulations.

By subsection (g), section 2, "no parking shall be permitted near the curb except for sale purposes." This provision was designed to prevent congestion on the market and clear the market space for the benefit of producers having marketing for sale. Further comment is unnecessary.

By section 3 it is provided "a seven-foot space shall be marked off at angles of approximately thirty degrees through the entire length of the market on the east and west side of the market." And subsection (a) 3 provides "all vehicles of every kind or character used for sales purposes shall be backed up at an angle to the curb and so placed that no part of the vehicle shall extend over the curb and sidewalks. Salesmen shall not stand on the sidewalks so as to block or interfere with traffic." We have already discussed this regulation. It is only necessary to add that it is a reasonable traffic regulation designed for the benefit of the public. It discriminates against no one and interferes with no one's particular rights.

By subsection (b), section 3 it is provided "no parking shall be allowed against the market house except by de-

livery trucks, coal, garbage, or ice wagons or trucks, when loading or unloading into or out of the market house, and then only for a period not to exceed thirty minutes. A line of travel shall at all times be left open on both sides of the market house.''

By reference to the plat, Exhibit ''A'' to the deposition of W. N. Smithson and the photographs, Exhibits 2 and 3 to the deposition of Sam Whitlock, it appears that after marking off the space where market wagons and trucks may be stationed and parked against the curb, that 15.5 feet of open space is left on the east side between the parking line and the market house, and 14.7 feet on the west side. This space was left open for traffic through the market.

Inside the market house it appears that there are 54 stalls occupied by dealers in produce. These dealers receive and send forth from their stalls rented from the city the varied produce handled by them. This regulation was designed to prevent congestion of the space left open for travel and to prevent obstruction of the way of ingress and egress to the market house. The regulation was reasonable and necessary.

By subsection (e), section 3, ''no empty vehicle or vehicle, which is substantially empty of products, shall remain standing on any free public market place of the city, but shall be removed immediately upon becoming empty or substantially empty. In the event any such vehicle is found empty or substantially empty on any free public market place of the city, and the owner has failed or refused to move the same, the market master, or director of public safety, may remove such vehicle, charging all expenses incident thereto to the owner.''

Ordinances should be certain in their application and operation, and their execution should not be left

674

the caprice of those whose duty it is to enforce them. *Jonesboro* v. *Knoxville,* 148 Tenn., 688, 19 R. C. L., pp 810-813.

If given its literal meaning, this provision of the ordinance could not stand because it would confer upon the market master the right to remove a wagon before the owner had disposed of all his produce.

Where an ordinance is susceptible of two constructions, it is the duty of the court to adopt that which would render it valid, since it must not be assumed that the lawmaker intended to pass a void law.

The word "substantially" used here in connection with the word "empty" must be construed to mean "really" or "actually," as in *Weston Assur. Co.* v. *Altheimer,* 58 Ark., 565; *Cheeseman* v. *Hart,* 42 Fed., 98; and *Commonwealth* v. *Wentworth,* 118 Mass., 441, referred to in 7 Words & Phrases, p. 6741, and *Elder* v. *State,* 162 Ala., 41, referred to in Vol. 4 (2 Ed.), Words & Phrases.

Municipal ordinances, like statutes, may be valid in some of their provisions and invalid as to others, and when the invalid portion is distinctly severable, leaving a complete enactment without it, the invalid part may be rejected and the ordinance stand. 43 C. J., 547; *McCamey* v. *Cummings,* 130 Tenn., 494; *Bond* v. *Taylor,* 119 Tenn., 229.

As we have indicated, subsection (e), section 2, appears to be unreasonable, but if excluded the ordinance as a whole would present a complete scheme of legislation. We are of opinion that this provision of the ordinance is void and the others valid.

As modified, the decree of the chancellor is affirmed. The costs of the cause in the trial court will be paid as adjudged by the chancellor. The costs of appeal will follow the result and be adjudged against the complainants.