## CENTRAL ALTAGRACIA, INC., Plff.,

*v.*

## JAVIERRE & GIL ET AL., Dfts.

---

Mayaguez, Equity, No. 190.

1. Ordinarily courts of equity will not decree the specific performance **of**

Note.—*Specific performance.*—For authorities dealing with various ques-

Central Altagracia v. Javierre & Gil.

contracts relating to chattels only, but an exception is where greater injury would result than could be recovered in damages.

2. Such a case is one founded on a contract to deliver to a sugar factory cane growing on a nearby tract, the loss of which would cause the mill to close down.

3. A decision, after hearing, ordering an injunction, as prayed for in the bill for that purpose, is a final judgment and is appealable.

4. When plaintiff sets up a contract with a clause providing a contingency on which the defendant would be entitled to release, and the defendant admits the contract, the burden of proof is on the defendant to show the happening of the contingency.

Opinion filed January 7, 1908.

———————

*Mr. N. B. K. Pellingill* and *Mr. F. L. Cornwell,* attorneys for plaintiff.

*Messrs. Hartzell & Rodriguez Serra,* attorneys for defendants.

RODEY, Judge, delivered the following opinion:

The complainant is a corporation organized under the laws of the state of Maine. Its sugar factory or plant is located some

tions relating to specific performance of contracts, see the following editorial notes: Of contracts as to personal chattel, note to Hepburn v. Dunlop, 4 L. ed. U. S. 66; of inequitable contracts, note to De Sollar v. Hanscome, 39 L. ed. U. S. 956; mandatory injunction to compel, for services, note to Moundsville v. Ohio River R. Co. 20 L.R.A. 167; of option contracts, note to Litz v. Goosling, 21 L.R.A. 127; of contracts for conveyance, where wife refuses to unite in conveyance, note to Barbour v. Hickey, 24 L.R.A. 763; of contract for sale of corporate stock, note to Ryan v. McLane, 50 L.R.A. 501; of contract between husband and wife to compromise pending or contemplated divorce suit, note to Oppenheimer v. Collins, 60 L.R.A. 412; of contract for municipal water supply, note to Asher v. Hutchinson, Water, Light, & P. Co. 61 L.R.A. 92; jurisdiction of equity to decree specific performance of contract affecting real estate in other state or country, note to Proctor v. Proctor, 69 L.R.A. 681.

III. PORTO RICO—17.

### Central Altagracia v. Javierre & Gil.

6 miles north of Mayaguez, in the island of Porto Rico. The plant has a spur of railroad connecting it with the main line of the American Railroad Company. It is located on a small patch of ground, and is a custom mill for grinding cane,— owning practically no land of its own, but depending upon surrounding cane planters in the vicinity and up and down the railroad for its supply and support. The grinding capacity of the mill is about 300 tons of cane per day in season. The value of the mill at the time of the making of the contract in question was about $200,000, but additions to the extent of sixty or seventy thousand dollars have been made since.

It will be sufficient for the purposes of this statement to say of the respondents that they are partners in the cane-raising business and are subjects of the King of Spain. Their land where the cane in controversy in this suit is raised, is located about the same or a somewhat greater distance south, that complainant's plant is north, of the city of Mayaguez, in the San German valley. It will not be necessary to consider the other respondent, the Banco Territorial y Agrícola, as it has disclaimed any interest in the proceeding.

The bill was filed June 21, 1907. A temporary restraining order was issued under it, with an order to show cause, returnable at a short day; but, as no injury could occur until the grinding season of the crop of 1907-8, which would not begin until at least the middle of January of the latter year, and as the court was then about to take its summer vacation, counsel on both sides agreed that the restraining order should remain in force and matters be in abeyance until a final hearing should be had at some convenient time in the fall of 1907. The answer was filed August 27, 1907. On Tuesday, December 10th, the court opened at Mayaguez, and a full hearing was had on

the merits in the cause, which lasted continuously during four days thereafter, or until noon on Saturday, December 14th, following. During this time nearly forty witnesses—counting recalls—were heard, a large number of exhibits and a considerable amount of correspondence was introduced, and the case was fully and ably argued by counsel on the respective sides.

For several days previous to these expressions of our views, we have caused the stenographer to read his notes of the evidence almost completely, and parts of them several times, and have again read the exhibits and correspondence with unusual care, and have also examined the law applicable to such a case at some length. This last labor has been the greater, as counsel have not filed any written briefs before us.

The cause turns essentially on a question of fact, and one of such an unusual character as to be extremely embarrassing to the court, and which embarrassment is increased by a most unusual and annoying amount of direct conflict and contradiction in the evidence presented.

Complainant alleges in substance that respondents Javierre & Gil are operating and growing sugar cane on two plantations located as stated, known as "Florentina" and "Estero." That the area of both combined is about 500 acres. That about 350 acres thereof are planted in cane at the present time. That for some time, in fact, several years, previous to the month of December, 1906, an Englishman named Swift had been in and around Mayaguez and the San German valley aforesaid, promoting the erection of a sugar central to be financed by English or American capitalists, the same to be known as the central "Eureka," and that the respondents Javierre & Gil, with others, to be hereafter mentioned, had been working with him and in conjunction with him and others, also to be hereafter mentioned,

Central Altagracia v. Javierre & Gil.

and were endeavoring to have the said central become **an assured**
fact.    That on the 10th day of said month, the respondent firm,
through their Mr. Clemente Javierre, entered into an ordinary
printed contract such as is usual between sugar factories and
cane growers, with this complainant, by which they agreed, for
a stipulated price, which complainant alleges was and is un-
usually large, but which latter fact respondents deny, for the
grinding of the cane to be grown upon said two properties, under
conditions in the contract set out, for five crops, beginning with
that of 1906-7, the latter being then ready for grinding, and
which first crop was immediately and in due time thereafter
completely ground at complainant's mill and in part perform-
ance of the contract.    But complainant further alleges that,
at the time of the making of said contract, the said Javierre
contended that he was still bound to the proposed "Eureka"
project of said Swift, and which might yet be built, and for that
reason insisted upon an exception or reservation to the term of
five years in the contract aforesaid.

In the printed (Spanish) contract which they entered into,
and which is in evidence, clause 14 thereof is the one wherein the
term of the contract would ordinarily be filled in.    This clause,
in both the original and duplicate introduced in evidence, ap-
pears to be crossed out, and the following typewritten clause,
only the first paragraph of which is really material, was indorsed
on each of the same above the signatures, apparently in lieu of
the clause erased, that is to say: "La clausula 14 queda modi-
ficada como sigue.: La duración del presente contrato será de
cinco cosechas, comenzando con el de 1906-7; entendiéndose,
sin embargo, que si, para el dia 15 de enero de 1908 estuviere
montada o montándose, la proyectada Central "Eureka" la
segunda parte tendrá el derecho de cancelar el presente con-

Central Altagracia v. Javierre & Gil.

trato, dando aviso á la primera parte el lro de Octubre de 1907.

Adición:—La primera parte se compromete á poner en la estación de Hormigueros suficientes vagones cada dia laborable, para que la segunda parte pueda cargar alrededor de cien toneladas de caña diariamente, salvo los casos de fuerza mayor."

A reasonably fair translation of the first clause aforesaid is about as follows: "Clause 14 will stand modified as follows: The duration of the present contract will be for five crops, commencing with that of 1906-7, it being understood, nevertheless, that if, by January 15, 1908, the projected central 'Eureka' shall be mounted or in course of being mounted, the party of the second part shall have the right to cancel the present contract, giving notice to the party of the first part on the first of October, 1907."

That, notwithstanding the making of this contract and the fact that the contemplated or projected "Eureka Central" was not mounted or in course of being mounted, respondents had secretly conspired with others and rehabilitated with new and second-hand sugar machinery an old muscavado sugar plant and building situated on the property of one Mateo Fajardo, and had organized a corporation, calling the same "Eureka," to conduct the said rehabilitated plant, and were claiming that the same was in fact the "Eureka" mentioned in the contract aforesaid, and were asserting that they would deliver the cane in controversy here to the same, and were refusing to consider themselves bound to complainant, but insisting that they were not, and that they would not continue to deliver cane to complainant's mill, but would give the stipulated notice and would end the relations of the parties.

Ordinarily this would be a bill for the specific performance of contract, yet the relief sought for is peculiar. Counsel for

### Central Altagracia v. Javierre & Gil.

complainant no doubt realized that cases are rare where a mandatory injunction will be issued by a court against any respondent, when compliance with it involves the performance of personal labor or services, for the reason that, in most of such cases, there is an adequate remedy at law, and because the compliance with such a mandate might trench upon the law's abhorrence of slavery. Hence, counsel has taken a course for which there seems to be ample precedent, that is, the negative side of the proposition. In other words, he prays that the respondents be enjoined from delivering any of the cane grown upon the two plantations in question, which they are under contract to deliver to complainant's mill, to any other mill during the term for which they are so bound. 3 Parsons, Contr. 8th ed. p. 321, note, Opera Singer Cases; Metropolitan Exhibition Co. v. Ewing, 7 L.R.A. 381, 42 Fed. 198. Counsel for both sides appear to acquiesce in this view of the law, and have apparently submitted their rights to the court with that idea; at least, the trial proceeded with that tacit understanding.

It may be well to note that it is pretty well settled in law that equity will not ordinarily force a specific performance of a contract that relates only to chattels, because usually, when the contract does not refer to realty, there is an adequate remedy at law. However, this rule is not without exceptions, and in all cases where greater injury may occur to complainant by the breaking of a contract than could be recovered under the rule governing the measure of damages at law, equity will grant relief. In this case, if complainant should sue at law, the measure of damages would be the value of the case, or the profit on it that complainant would make by grinding it, and no account could be taken of the probably greater injury to the

Central Altagracia v. Javierre & Gil.

entire plant by reason of being deprived of a sufficient quantity of cane to keep a mill of that capacity going. See Parsons, Contr. 8th ed. pp. 305, 317, 318, and notes. See also Willard v. Tayloe, 8 Wall. 557, 19 L. ed. 501.

The answer admits the execution of this contract for the grinding of the five crops of cane as above set out. It also admits the truth of several paragraphs of the bill that it is unnecessary at this place to refer to, avoids other paragraphs, and, in substance, sets up about the following state of facts:

That for several years previous to December 10, 1906, different persons, including respondents, had been endeavoring to bring about or promote the erection of a sugar central in the San German valley, where the property in question is located, the said central to be called "Eureka." That the most recent principal promotor of said enterprise was an Englishman by the name of Swift, but that he had entirely failed to secure the necessary funds to erect the plant, and that therefore the planters in that vicinity, including respondents, had agreed among themselves to raise the money and erect it on their own account, and that this agreement had taken place nearly two months before the making of the contract with complainant, and that the latter's officers knew this to be the fact. That this intention of the planters of that vicinity to erect this sugar central was the reason for the insertion of this limiting clause in the principal contract. That the planters did thereafter in fact get together, raise the money, and have, as matter of fact, now erected said "Eureka" sugar central; and that because of this respondents claim and have in law a perfect right to give notice to complainant, as provided for in the said reservation clause, and to have the said contract cease and determine, and

Central Altagracia v. Javierre & Gil.

to hereafter deliver their cane to this new sugar factory, which they insist is in fact the "Eureka" central referred to.

No replication was filed, but the parties treated the situation as though there had been, and went to trial on the issue thus raised. The proofs varied very considerably from the pleadings, but, as the principal question to be determined is the sole question as to the meaning of the reservation in the contract, the case was argued as if in fact the pleadings had been amended to conform to the proofs. A lot of immaterial testimony crept into the case, but we have avoided any evil effect of it in our review of the whole case.

During the trial the court made an inquiry from the bench as to where the burden of proof lay, or as to which of the parties, under such state of facts, had in law the laboring oar. The matter was not then definitely settled, but it was announced that, as great latitude had been given both sides to introduce all proofs which could in any way throw light upon the issue, we would take the question of the burden of proof into consideration when passing upon the rights of the parties on the proofs as finally submitted.

We have since examined the question and are of opinion that, under a contract like this, which was complete and absolute between the parties, the execution of which they both admit, and which, unless interrupted by the occurring of an event mentioned in the contract itself, is to continue for five years, the burden of proving the fact that such contingency has arisen is upon him who alleges it; and that therefore, without departing from the general rule that the burden is always upon the plaintiff to make his case, the burden here is upon the respondents to show that the "Eureka" to which they now claim the right to deliver their cane is the same "Eureka" contemplated

in the clause of the contract referred to. This they claim they have fully done; but, passing that for the moment, it seems to us that this proposition is analogous to one which often arises in the mining states in cases commonly known as apex side-line issues. In such proceedings, the plaintiff, having perfect title to the surface ground of his mining claim, shows that fact on the trial. The defendant in ejectment admits all this, and shows that he also has perfect title to an adjoining claim within the boundaries of which is the apex of a lode or vein of ore which, as he follows it in its course downward, departs from the perpendicular into and beneath plaintiff's claim, and that under the law he has a right to thus follow his vein and mine his ore. It is pretty well settled that the defendant has the affirmative of such an issue. See Bell v. Skillicorn, 6 N. M. 399, 28 Pac. 768; Greenleaf v. Birth, 6 Pet. 302, 8 L. ed. 406; Bagnell v. Broderick, 13 Pet. 436, 10 L. ed. 235. A very interesting exposition of this question is set out in the opinion of Judge Philips of the circuit court of Colorado in Cheesman v. Hart, 42 Fed. 105.

The actual proofs in this case were about as follows:

An elderly gentleman, evidently of some considerable dignity and prominence in that section, by the name of Antonio Ramon Cabassa y Tasara, who has been for many years—and perhaps all his life—a resident of this San German valley, testified at some length, and from his evidence and that of others it appeared that he has been endeavoring to secure the erection of a sugar central there for several years last past, perhaps even as far back as the beginning of American occupation, in 1898. That his insistence as to the project, and his claim from time to time that he had or was about to secure capital to accomplish the desired result, caused him to name the project "Eureka;"

in other words, that he had found it, or succeeded. There was some evidence that his many failures in accomplishing his desire caused his efforts to be regarded in the community as somewhat of a joke, and certainly this was so during the last two or three years. However, whether any real important effort was made in that regard in the early days or not is not so certain, but it is unquestionable that, some time in the summer of the year 1905, this Mr. Cabassa, in company with a capitalist named A. L. Arpin, went around among the cane growers and secured contracts for the grinding of cane in a proposed central from some of the planters, the area of which amounted, in all, to an aggregate of several thousand acres. All of these contracts, which were taken in Cabassa's name, were shortly thereafter assigned to this Mr. Arpin, and the latter, in turn, some time in the summer of 1906, assigned all of them to this Englishman, Mr. A. E. H. Swift, who had, a short time previous, come upon the scene to promote a central. Arpin then stepped out of the equation, and Swift and Cabassa, with a sugar machinery engineer named D. L. Thompson, began to agitate the matter. Swift was the person who undertook to raise the money, while Cabassa was, or considered himself, a sort of a spokesman for the planters. It appears that Mr. Thompson did not do much save to wait around with a view of seeing if the project became a reality, so that he might be employed as its engineer and probably invest some of his means in it. Swift made several trips to New York and London and dealt, or pretended to deal or negotiate, with capitalists, probably in both places, but did not seem to be able to definitely secure the money soon enough to suit the planters. Early in September, 1906, Cabassa and the people in the San German valley aparently became much dissatisfied with him and exasperated at his delay, and Cabassa

Central Altagracia v. Javierre & Gil.

sent a cablegram from Mayaguez to London, requiring that he get some local financiers on the island or the Bank of England to put up some £50,000 security as evidence of his good faith. By this time many or most of his contracts with the cane growers thus assigned to Swift by Arpin were expiring or had already expired. So, on October 20, 1906, a meeting of Cabassa and several of the planters, including the respondent Clemente Javierre, was had at the house of Cabassa, with a view to considering the matter of the central. By this time Mr. Cabassa, it appears, had become pretty well disgusted with Mr. Swift, and the following day he, with Javierre, sent Swift a cablegram, attempting to break off all negotiations. Swift or his friends replied to at least the first of these cablegrams and tried to have matters suspended until Swift could return from England.

One of the principal planters of this San German valley is a certain Mr. Mateo Fajardo, a gentleman of evident education and prominence, who with his brother Luis is the owner of a very considerable estate there; but at least Mateo's cane lands are under lease to the Guanica Central, a gigantic sugar-making plant situated a considerable distance off to the southeast, but connected by railroad with the San German country. This man Mateo Fajardo, as near as the court can gather from the evidence, not only objected to outside capital erecting any central in that vicinity, but also desired to profit personally by having any central that should be built, located upon his own estate in some old buildings that came to him from his father's estate, which were used in the manufacture of muscavado sugar years ago, but which have been idle for many years. This Mr. Fajardo was at the meeting held on October 20, 1906, and it appears from the evidence that he was not only one of the principal spokesmen, but was quite active against Mr. Swift,

Central Altagracia v. Javierre & Gil.

and probably was largely instrumental in causing the second cablegram to be sent to Swift the following day. At the time of this meeting, Mr. Gil, the other respondent, was in Spain, and only Clemente Javierre was present representing the firm. Mr. Thompson, who was in the country at the time, was not present, and, according to his evidence, never saw or knew of the written agreement said to have been made then, until about the time of the incorporation in April, 1907. It is claimed that at this meeting an agreement in writing was entered into between the two Fajardoes, Mr. Cabassa, and the respondents Javierre & Gil, and was signed by them and each took a copy, but that it was signed by Clemente Javierre in his own name, pending the return of his partner, Gil, from Spain. Counsel for complainant insists that this agreement, a copy of which was introduced in evidence, is false, and that it never was in fact made there at that time, but was manufactured for the purposes of this case, and they contend that all the facts in the case show the reasonableness of this contention, and that evidence of such fact would probably appear in certain letters from respondent Clemente Javierre to his partner, Gil, in Spain, and in a letter of his to one Wilson, here in Porto Rico, if they were produced, which complainant could not procure, but which ought to be in the power of respondents, which they deny, and made a showing to account for the loss of the letters referred to.

Complainant also introduced evidence to show that in the latter part of October, 1906, respondent Clemente Javierre went with this Mr. Mateo Fajardo to the Guanica Central, and there tried to make a contract to grind his cane for one year, but he wanted to get 5½ per cent sugar with a 25 cent freight reduction, but that the Guanica people would not pay this price, which they considered too high, unless the contract was

Central Altagracia v. Javierre & Gil.

made with them for a five-year term. Evidence was also presented, intended to show that, after the cablegram trying to break off negotiations with Swift was sent, on October 21, 1906, Javierre entered into negotiations with, or received offers from, people promoting another central in that vicinity, known as "La Rochellais," and it also appears that Cabassa and the people in the valley tried to negotiate with one W. S. Marr and a practising attorney here named Dexter with a view to having both or one of them promote a central in that vicinity, but that nothing came of this latter effort, although thirty days' time was given them to consider the matter.

It appears further that, immediately after the meeting of October 20th, Mr. Fajardo proceeded to make inquiries as to where he could raise money to help build a central or to put old machinery or machinery that was partly old and partly new into the buildings on this estate of his which was called "San José," and it is certain that he wrote to bankers and others and accosted several people with that end in view, besides requesting a man who was going to Cuba to make inquiries there as to second-hand or other machinery that might be bought. It is also in evidence that this Mr. Thompson, at the request of Cabassa, Fajardo, and others, shortly afterwards proceeded to make estimates as to the cost of the renovating of these old "San José" buildings or plant and the mounting of second-hand and new machinery therein, and that he made several trips and considerable inquiry in that regard. It also appears in evidence that, along in 1905 and 1906, while Javierre was first connected with Cabassa and Arpin, and later with Swift, he had his cane ground at the central "Coloso," north of Mayaguez, and that, because of some mishap to the machinery of that concern, quite a portion of his crop was ground with the permission of "Coloso,"

## Central Altagracia v. Javierre & Gil.

and at the request of Javierre himself, at the mill of complainant, "Altagracia," which had then recently been renovated considerably. Complainant claims that this grinding was done at that time for respondents under the promise that they would later make a long-time contract with complainant for the grinding of their cane. It further appears that, in the summer and fall of 1906, Mr. Cornwell, the manager of "Altagracia," was quite anxious to secure this long-time contract to grind respondents' cane, and sent for Javierre several times in midsummer and during that fall with a view to getting him to sign such a contract, but was put off first on the ground that it was too early to make a contract, and that he would sign it all right in the fall, when Cornwell came back from the States, where he was then about to start for, and for Cornwell not to worry about it, and later on one excuse or other up to December 10th, when it was signed. Mr. Cornwell was absent in the States until some time in the early fall of that year, and after his return to the island had to go back almost immediately to the States, owing to some financial interests he had in connection with what is known as the Ceballos failure, and that he did not return to the island until the first days of December, 1906. During his absence his bookkeeper, William Falbe, tried to get Javierre to sign the contract, but without success. After Mr. Cornwell's return he kept sending for Mr. Javierre with a view to getting this contract signed, and finally, on December 10th, Javierre came to his office and signed it. This Mr. Falbe, who was then working as bookkeeper for the complainant, filled out the contract and wrote out, first with a pencil and afterwards with a typewriter, this limitation clause, which was indorsed on both copies of the contract as stated, and about the meaning of which this whole controversy has arisen.

Central Altagracia v. Javierre & Gil.

Evidence as to what took place at the time of the actual signing of this contract is meager and very unsatisfactory indeed. On the one hand, Mr. Cornwell and his clerk, Mr. Alemar, state that the exception or reservation was put in that contract wholly with reference to the Swift project; because, as Mr. Cornwell says, Mr. Javierre was—as he said himself—still bound to Swift by a contract which he had outstanding, although it was believed that Swift would not succeed in getting money to build any central, and that therefore the contract would in fact last for five years, and that Cornwell for that reason considered that he was safe in accepting the contract, as he knew it would last for the full term, even if he was anxious to get it, and so he paid five and a half pounds of sugar per hundred pounds of cane, with only a 25 cents freight reduction, instead of the 5-pound payment and the 50 cents reduction which was, as he contends, customary, and further was warranted in putting from sixty to seventy thousand dollars worth of improvements in his mill, which was done; that if Javierre kept silent when he ought to have spoken, he should be estopped now. Mr. Falbe, the bookkeeper, who wrote this additional clause to the contract, but who has since started an opposition mill of his own, states that the only thing he can recollect as having been said when Javierre and Cornwell came into the room where he was, although they had a conversation in the outer room some time before, was that Javierre insisted that, in addition to the word "montado," the word "montándose" should be added, so that it would read that he should have the right to end the contract if, on January 15, 1908, the projected "Eureka" was either in fact then mounted or being mounted.

Mr. Cornwell is, in addition to being president of complainant's sugar company, also a practising lawyer at Mayaguez,

Central Altagracia v. Javierre & Gil.

and states that he knew all about the efforts of Cabassa and Arpin to promote a central in the San German valley two or three years back, as the papers were made in his office; but that he never heard of this claim that "Eureka" was an old story in that valley until this bill was filed. That he never heard of the name "Eureka" until about the time Arpin was leaving and Swift came upon the scene, and that Swift's project was known by the whole community for about a year previous as "Eureka." That Javierre made no mention in any conversation whatsoever to him of any efforts of the local planters to build a central, or of their having entered into any arrangement to that end save with Swift, or that they intended to do so; and he testified—and in this he is corroborated by several witnesses—that the fact that such a central as this one by the local planters was going to be built was not known in the community until just before the incorporation of the concern, in the latter part of April or the first of May, 1907, and that he had his ear to the ground for such news and would have heard it if it was at all known.

On the other hand, Mr. Javierre testifies that he met Mr. Cornwell one night on the street in Mayaguez, and told him about the fact that Swift had entirely failed to build the plant, and that the planters themselves were going to build it, and that he talked of this often to Mr. Cornwell, and that he thought Mr. Cornwell must have been tired of hearing it. All this Mr. Cornwell emphatically denies. Mr. Mateo Fajardo also asserts that he told Mr. Cornwell of their intention to build this central themselves, and so does his brother, Luis Fajardo. Mr. Cornwell denies each and every one of these statements in toto and gives his reasons for saying that the parties must be mistaken. On the witness stand, the Fajardo

Central Altagracia v. Javierre & Gil.

brothers and Mr. Cabassa were rather emphatic and positive in their statements and seemed to be deeply interested in the controversy. We might state at this place, in the expression of these views, that the controversy here is strictly between the complainant, the Central Altagracia, and the respondents, Javierre & Gil and their other partner, Mr. Felix Ramos, and that the desires or interests of Mr. Fajardo or Mr. Cabassa, however laudable or intense, can cut absolutely no figure in the strict legal rights of the parties, and that their testimony can have no weight in the case save as it may throw light upon the controversy itself between the real parties in interest.

It was fully proved that Fajardo, Cabassa, Javierre, Thompson, and others did in fact, on May 4, 1907, organize a corporation which they called "Eureka" central, and that respondents Javierre & Gil each took fifteen thousand dollars worth of the capital stock thereof, and at least made a contract with it, whether simulated or not, to deliver their cane from the land in controversy to it to be ground for a period of ten years, beginning with 1908. Of course, it can be said in answer to this that all of these things which they did after the signing of the contract with complainant and after the issuance of the restraining order herein should not be permitted to affect complainant's rights if, in truth, it is entitled to have the cane in controversy ground at its mill for four additional years.

Complainant, of course, claims that this central so erected is nothing but the remodeling of an old mill by Mr. Fajardo and his friends, and that he has induced Javierre & Gil to join the concern, and has, by calling this new Fajardo project "Eureka," made them believe that they can break their contract with complainant, and that he, Fajardo, in fact has dominated Mr. Cabassa and the Javierres into this belief, and complainant con-

III. PORTO RICO—18.

### Central Altagracia v. Javierre & Gil.

tends that this is inequitable and that it should not be permitted, because they intimate that they were induced to spend a large amount of money improving their mill by the belief that Swift would not succeed, and that he was the only person whose action could break this contract; and further, that if in fact this agreement between the local planters was entered into on October 20, 1906, or one and two-thirds months before Javierre & Gil made the contract with complainant, because Mr. Javierre remained silent and did not notify complainant of the intention of these parties to build the "Eureka," that therefore respondents Javierre & Gil are estopped in law from now damaging complainant by taking away this large amount of cane from its supply, which they show is a large portion of their whole available supply, and that to be deprived of it will in fact not only deprive them of their profit on the grinding, which they calculate is $1.50 a ton or thereabouts, but will ruin their plant by leaving it without sufficient cane to come up to its capacity, and no other supply is available at this time. Complainant also shows, by introducing a large amount of correspondence between this man Swift and the house of Moral & Company, of Mayaguez, and in other ways,—the introduction of none of which was objected to, but in fact was consented to,—that Swift did not give up his project when they cabled him on October 21, 1906, but that he in fact came here afterwards and went out to the vicinity in question, and that Mr. Cabassa called a meeting of the planters for his benefit, at which Mr. Fajardo and others attended. Mr. Cabassa states he did this just to please Swift, but knew at the time Swift could not succeed. The evidence shows that this meeting amounted to nothing as the planters by that time had become thoroughly disgusted with Swift, that Mr. Cabassa and Mr. Fajardo talked so much

Central Altagracia v. Javierre & Gil.

against him that nothing could be done towards renewing cane contracts which he wanted for his "Eureka" enterprise. Mr. Javierre was not at this meeting and states that he absented himself because he had, in the previous October, given up the contract he had with Swift to him, and told him that he would have nothing more to do with him,—that Swift asked him for the contract. Mr. Cornwell denies with feeling that Javierre gave up this contract to Swift, and insists that he not only did not do so, but that Javierre's contract with Swift was in full force when the principal contract was entered into December 10, 1906, and that its existence and binding force between the parties was the sole reason for the putting in of any limitation as to a time shorter than five crops.

After a careful examination of the evidence, we are of opinion that the respondent Mr. Javierre, if in fact he signed the agreement of October 20th, did not consider himself bound by it, and Mr. Fajardo and Mr. Cabassa did not know for many months thereafter whether they could succeed in erecting any central. This is manifest because Mr. Cabassa testified that Mr. Javierre took little or no part in the efforts to organize this new central until late in the spring of 1907, when he saw that it was going to be a success, and it is further made manifest from the evidence which shows that Mr. Fajardo had to do a good deal of work in the way of importuning Mr. Javierre to keep him from making deals with other proposed or talked-of new centrals. It is in evidence that the Guanica people had talked of going into the San German valley and erecting a central, and of course the cane of this valley is more or less subject to this new Rochellais central that is being erected by Wilson, Falbe, and others. Mr. Javierre himself seems to appreciate that Mr. Fajardo is largely responsible for this con-

Central Altagracia v. Javierre & Gil.

troversy, because Javierre while on the stand testified with some asperity that it was Mr. Fajardo who got him into the condition he is now in. Mr. Thompson kept up his dealings with Swift and others up to the very eve of the incorporation of this new so-called Eureka or San José central. This is made manifest by his own evidence and by a copy of a letter which he wrote from Mayaguez to Mr. Swift in San Juan, Porto Rico, as late as April 24, 1907, and the copy of the letter also shows for what it is worth that the Javierres were trying to do business with Wilson and the Guanica people after the date they claim to have concluded to build this new central.

The letter from Thompson to Swift is as follows:

Box 382, Mayaguez, April 24th, 7.

Mr. A. E. H. Swift,

c/o Mr. R. A. Macfie,

San Juan.

Dear Mr. Swift:—

On Thursday morning last, before leaving with train for Mayaguez, I wrote you a pencil note and left it at Macfie's office, advising you that Wilson meant business. From what young Wilson, whom I met in the train the following day, told me, I have no doubt that you received that note safely. Young Wilson and Mr. Falbe were full of the project and stated that they had everything arranged, including the credit at the Colonial Bank and the machinery arranged for by cable with Mirrless Watson of Glasgow. I wired to Fajardo, who met me at the train, and he told me the whole thing was a humbug, and that the Javierres would not do anything with Wilson. I did not know what to think as they were also negotiating with Guanica, but the whole matter was settled yesterday when a

Central Altagracia v. Javierre & Gil.

company was formed and it was decided to put old machinery in Fajardo's buildings, the principal stockholders being the Fajardos, Javierre, Gil, Cabassa, and myself. I simply had to go in to save myself falling between yourself and Wilson.

Yours very truly,<br>(Signed) D. L. Thompson.

Mr. Swift, who was still in San Juan, Porto Rico (almost the 1st of May, 1907), and still endeavoring to build this very central, the one he had been promoting for a couple of years, sent a press copy of this letter of Mr. Thompson to Moral & Company, at Mayaguez, and through them it was introduced in evidence by complainant, together with a letter from Mr. Swift, dated April 26, 1907, to Moral & Company, wherein it is plainly set out that he, Swift, still hoped to build his Eureka central, and does not regard Fajardo and Cabassa and the Javierres as having any right to appropriate either the name "Eureka" or the project. Mark this sentence which occurs in it: "Will Javierres' participation in Fajardo's factory affect Eureka being put up on their estate, or must we look for another mill site?"

The whole letter is as follows, and it throws a world of light on this controversy:

San Juan, Porto Rico, 26th April, 1907.

Messrs. Moral & Co. S. en C.,
Mayaguez, P. R.

Dear Sirs:—

I wrote you a letter yesterday, and this morning have received a letter from Mr. Thomson of which I inclose you a press copy, telling us of the formation of a company to put old machinery in Fajardo's buildings.

Central Altagracia v. Javierre & Gil.

Messrs. Javierre & Gil it appears are shareholders. They have a contract with Altagracia Central by which they are bound to have their cane ground at Altagracia for five years if work for the Eureka factory is not begun by October of this year. Will Javierres' participation in Fajardo's factory affect Eureka being put up on their estate, or must we look for another mill site?

It would appear to me that Fajardo's factory, being small, will not affect the necessity which exists for a larger factory to save the district being gobbled up by Guanica.

Please give me your ideas as to the plan to be pursued now we know of the establishment of Fajardo's factory, until I receive which I will not write to my friends.

I remain,

Yours truly,

(Signed) Arthur E. H. Swift.

Now suppose the Guanica people had in fact come into the valley and erected a central, or suppose the Wilson-Falbe people had joined with Cabassa and Fajardo and erected one and called it "Eureka,"—on the evidence here could it be claimed that such fact would give the Javierres the right to break this contract? Let us suppose that after October 1, 1907, the date when the Javierres, under the limitation clause, could give notice to complainant of their intention to break the contract, that Swift had actually gone on and built his Eureka central, as he was liable to have done, for he was still working on it in May, 1907, after this new concern had been incorporated, would not Mr. Javierre, under all the evidence here, have the right to claim that Swift was the party whose work had given him the absolute right to break his contract with Alta-

Central Altagracia v. Javierre & Gil.

gracia? Remember that, from the best evidence in the case, "Eureka" was to be built on Javierre's own property. If Swift had built and a controversy had taken place between him and Fajardo as to the right to use the name "Eureka," who would have won?

As stated at the outset, we have been and still are much embarrassed in this cause because of the serious conflict in the evidence, and the intense feeling apparent in the matter, as well as because of the large amount of money involved. We are confronted with a peculiar situation. On the one hand, a man should have absolute freedom to deal with his own property as he sees fit; while, on the other hand, he should so use his own as not to injure others. The ending of this contract means heavy damage to Altagracia, yet, if respondents' contention is right, the court cannot prevent it, even though to hold the contract in force for the five crops insures to respondents a good price for their cane. In our examination of the text writers and authorities with reference to suits to enforce specific performance of contracts, we were impressed with the unanimity with which it is held that a chancellor has great discretion in this sort of a case; and while, of course, he is bound to follow the law, he can and often does, because of changed conditions, modify the strict terms of agreements so as to do equity between the parties. Yet it appears to be impossible to do that in this case because no facts warrant it. The contract must either be sustained for its full term or be broken under its own terms. There is no room for any half-way course.

It was suggested during the trial and argument by counsel that because this is a mere application for an injunction, the decision could not be considered such a finality as would entitle either side to take an appeal from the decision of the court in

Central Altagracia v. Javierre & Gil.

the premises. We are unable to take this view of it, because we are of opinion that all the rights of the parties are submitted in this issue, and that the court's decision is such a finality as that the losing side can take an appeal to the Supreme Court of the United States from our action, and we so hold.

While we have stated several times in this opinion that there is great conflict in the evidence, we do not wish to be understood as necessarily charging any of the parties or witnesses with having wilfully sworn falsely. We have practised law a sufficient number of years and have seen enough of the world to know that the best of men will understand things differently, and in their enthusiasm for their own side of an issue will unintentionally give prominence and color to their own desires, so that only a neutral mind can properly discount and weigh the statements made.

As stated, we feel that the burden is on the respondents as to the real issue in the case, and we find that they have not, by a preponderance of the evidence, established their right to have given this notice to complainant on October 1, 1907, and to end the contract. Therefore we hold that they are bound to supply their cane to complainant's mill for the full term of the five crops; but, as the prayer of the bill is for negative relief, our order will be that the temporary restraining order be made permanent so as to enjoin respondents, for the full term of the five crops of cane set out in the complaint and contract, or so long within such term as complainant is able, willing, and ready to receive, grind, and pay for the same, from delivering any of such cane to the San José or so-called Eureka mill described in the answer, and it is so ordered. A proper order or decree will be prepared to carry out this intent and decision of the court.